𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## HOPEWELL HEIGHTS DEVELOPMENT COMPANY, INC.,
### v.
### KAGAY-MARSHALL REALTY COMPANY.

March 18, 1920.

REAL ESTATE BROKERS—*Compensation of Broker—Construction of Contract—Case at Bar.*—The owner of a tract of land subdivided it into lots and gave a real estate broker an exclusive agency for six months for the sale of the lots. The contract provided that the broker should receive twenty per cent. on the list prices and one-half of the overage on the prices which might be placed upon said lots (referring to the actual selling prices) over and above the list prices, said commissions to be paid out of three-fourths of the collections received on sales until they are paid in full. The difference between the list prices and the actual selling prices is what was meant by the word "overage."

*Held:* That the twenty per cent. of the list price and one-half of the overage together constitute the commissions provided for in the contract, and these commissions were to be paid in full out of three-fourths of all collections of purchase money made by the owner, as the contract is not silent as to when the "overage" compensation to the agent was to be paid.

Error to a judgment of the Circuit Court of city of Petersburg, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

This case involves the question of whether the defendant in error (the plaintiff in the court below), the sales agent of the vendor, under a certain contract in writing, has the right to demand payment by the vendor, out of certain

collections of purchase money, of certain compensation to the agent for making sale of certain land.

The vendor is the plaintiff in error, having been the defendant in the court below, and the parties will be hereinafter referred to as vendor and agent.

The contract is as follows:

· "This memorandum of agreement made and entered into this 23rd day of September, 1915 by and between the Hopewell Heights Development Company, Incorporated, by Walter Saks, prest., party of the first part and the Kagay-Marshall Realty Company of Illinois, party of the second part.

"Whereas the said party of the first part are the owners of a tract of 36 acres at Hopewell and desire to sell the same as lots, and

"Whereas the parties of the second part are equipped to sell, advertise and conduct lot sales on the said tract.

"It is hereby agreed that the said Kagay-Marshall Realty Company are hereby appointed exclusive agents for said lots for a period of six months from date herein and upon the following terms and conditions:

"First.—The parties of the first part agree to have the property surveyed and platted and suitable lot markers and street signs ¹erected, and to furnish maps and blueprints of said subdivision. To have the streets and avenues graded and the property cleansed of all weeds and under-brush and to construct sidewalks on the main street, with the understanding that sidewalks are to be constructed on other streets providing all lots are sold on those streets. To build an office and depot station on the property and to erect such other buildings as they may deem advisable and render the premises generally in shape for a sale.

· "Second.—The parties of the second part agree to furnish the necessary advertising matter and transportation of prospects to show the lots, and will conduct and manage

76 Hopewell Hgts. Dev. Co. v. K. M. R. Co., 127 Va. 74.

Statement.

the sale and make all arrangements proper, in their judgment, for a successful sale of the property. And agree to maintain an organization of five high class salesmen and to devote their best efforts and use every legitimate means to dispose of the above mentioned tract.

"Third.—The party of the first part agrees to donate two lots to be given away for advertising purposes and to furnish and deliver and execute such contracts, deeds and other evidences of title as all persons securing lots may at that time be entitled to receive, said lots to be free and unencumbered with covenants of general warranty. It is agreed that failure to deliver or execute contract, deeds or other evidence of title or to make the improvements mentioned above, shall not stand as a bar for collection of commissions due sales agents under this contract.

Fourth.—It is agreed that the subdivision of 36 acres will be platted into approximately 400 lots and will be priced on an average of $200.00 a lot, except lots fronting on street car line to average $300.00 a lot or any one street that the party of the first part designates.

"Fifth.—It is agreed that the said Kagay-Marshall Realty Company shall have the exclusive sale of this property and shall receive a commission of 20% on the above prices and one-half of the overage on the prices which may be placed upon said lots over and above the prices mentioned herewith, said commissions to be paid three-fourths of the collections received on sales until they are paid in full, lots to be sold on terms of one-fourth cash and the balance four, eight and twelve months, with 6% interest on deferred payments, or on terms of one-fourth cash and the balance at $10.00 per month with 6% interest on deferred payments.

"Sixth.—The Kagay-Marshall Realty Company guarantee that they will not handle or conduct sales on any subdivisions adjoining or in the immediate vicinity of Hopewell Heights, during the life of this contract. They also

guarantee that after the opening sale that they will sell at least twenty-five lots every thirty days during the period of this contract or that they will forfeit the same.

"The party of the second part also guarantees that they will spend at least $1,000.00 to advertise and promote the opening sales on this property by November 15, 1915.

"Seventh.—It is agreed that the stockholders in the Hopewell Heights Development Company will be allowed a commission of 5%, which will be deducted from the commissions to be due the sales agents, on all sales which the said stockholders make personally without the assistance of the said sales agents or their representatives.

"Executed in duplicate the day and year first above mentioned."

After the contract was executed the land was platted into 426 lots. The vendor exercised the option given it in the fourth clause of the contract and designated that the lots fronting on Fifth avenue, shown on the plat, should sell for an average of $300.00 a lot, instead of the lots stipulated in the contract to sell for that price and mentioned therein as fronting on the street car line (which was on another street) ; leaving the other lots to be sold for an average of $200.00 a lot as stipulated in the contract. There were ninety lots on Fifth avenue and 336 other lots. These prices as agreed upon in the contract would produce the following totals:

```
90 Fifth avenue lots at $300.00 each...$27,000.00
336 other lots at $200.00 each......... 67,200.00
                                        _____
Total, 426 lots..................$94,200.00
```

These were the minimum average prices at which the agent was authorized by the contract to sell the lots and on which he was to receive the minimum compensation of 20%

78 Hopewell Hgts. Dev. Co. v. K.-M. R. Co., 127 Va. 74.

Statement.

commission provided for in the fifth clause of the contract. There is no controversy in the case about these matters.

The contract evidently contemplated, that, subsequent thereto, a minimum price list would be made of all the lots, in which it was expected that some of the prices of the respective classes of lots would be below and some above the $300.00 and $200.00 prices mentioned in the contract, but such varied prices were to average the $300.00 and $200.00 prices of the two classes of lots aforesaid, respectively. Hence the word "average" was used in the contract.

But after the lots were platted the only price list which was made of the lots was a selling price list, by which various prices were put upon each of all of the lots; all of such prices, however, except in a few instances, being much in excess of the minimum prices of $300.00 for the Fifth avenue lots and $200.00 for the other lots.

There was in fact no minimum price list of the lots made, but all of the lots on Fifth avenue were regarded as having a minimum price of $300.00 and all the other lots as having such price of $200.00, except in the few instances in which the selling price list aforesaid allowed lower prices. The lots were in fact "priced" in this way and the minimum prices were in fact fixed in this way. Such minimum prices are referred to in the record, however, as the "list price," or "list prices."

The selling price list of the lots resulted in the following totals:

| | |
|---|---|
| 90 Fifth avenue lots | $ 30,515.00 |
| 336 other lots | 97,385.00 |
| Total selling prices | $127,900.00 |

The difference between said "list prices" and said "selling prices" is what is referred to in the record as "overage," and is as follows:

> Total selling prices ...........$127,900.00
> Total list prices ................ 94,200.00
>
> Difference, or "overage" .......$ 33,700.00

With some trivial exceptions, which it is conceded in argument do not affect the result in controversy, all of the lots were sold by the agent in accordance with the contract, and sold at their selling prices fixed by the selling price list aforesaid.

At the time of suit brought the vendor had collected a little over one-half of the total purchase money for which the lots were sold. Such collections did not amount to as much as said total of the "list prices" of the lots, of approximately $94,200.00 aforesaid. But three-fourths of such collections, however, did amount to more than the total compensation claimed by the agent under the contract, which was 20% commission on the total of the list prices, of approximately $94,200.00 aforesaid, and one-half of the "overage" aforesaid, of approximately $33,700.00.

But the vendor took the position that according to the proper construction of the contract the agent was not entitled to any compensation on account of the "overage" provided for in the fifth clause of the contract until the vendor had actually collected purchase money to the amount of the $94,200.00 (approximately) total of list prices, or minimum price for the whole property, aforesaid. The agent, however, took the position that according to the proper construction of the contract none of the agent's compensation was dependent upon collections actually made, except to the extent of the limitation stipulated in the contract, namely, that all of it was to be paid out of three-fourths

80 Hopewell Hgts. Dev. Co. v. K.-M. R. Co., 127 Va. 74.

Statement.

of the collections of purchase money which the vendor had actually made as aforesaid, and that hence the one-half of the "overage," as well as the 20% commission aforesaid, was due and payable. Hence this action was instituted to recover the amount of such "overage" claimed to be due and payable to the agent.

There is much controversy in the case over the fact that the vendor from time to time made payments to the agent on account of the compensation claimed by the latter under the contract, and that such payments very much exceeded the amount of the 20% commissions on the $94,200.00 figures aforesaid and were, in part, expressly made on account of said "overage," thus evidencing, as the agent claims, the construction put upon the contract by the vendor up to a certain time. But the vendor claims that such payments of "overage" were merely advances on that account, made under a book-keeping arrangement which it was expressly understood between the parties should not prejudice their rights under the contract.

Neither party demanding a jury the court below proceeded to hear and determine the case; and, as appears from the record, being of opinion "that twenty per cent. (20%) of the list price and one-half of the overage together constitute the commissions provided for in the contract," the court found for the plaintiff, the agent, and assessed the agent's damages at $11,000.00 with interest from July 1, 1916, till paid "in full of all commissions."

It satisfactorily appears from the record that the agent was entitled to recover at least the amount of this judgment, if the court was correct in the construction given to the contract.

*Plummer & Bohannan,* for the plaintiff in error.

*Charles Hall Davis* and *Mann & Tyler,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

In the view we take of this case we shall consider it upon the assumption that the rights of neither party under the contract were prejudiced by the payments made by the vendor to the agent, which were in excess of the 20% commission admittedly due the latter. And—

1. The sole question before us is whether the proper construction of the contract itself is that given to it by the learned judge of the court below, namely, "that twenty per cent. of the list price and one-half of the overage together constitute the commissions provided for in the contract."

The material facts and what is meant by "list price," or "list prices" and by "overage," as such terms are used in the record in this case, all appear from the statement preceding this opinion.

That part of the contract of which the construction is drawn in question before us is contained in the fifth clause thereof, and is as follows:

"It is agreed that the" * * (agent aforesaid), "shall receive a commission of 20% on the above prices" (referring to the list prices aforesaid), "and one-half of the overage on the prices which may be placed upon said lots" (referring to the actual selling prices, aforesaid) "over and above the prices mentioned herewith" (referring to the said list prices), "said commissions to be paid three-fourths of the collections received on sales until they are paid in full * *"

There is a manifest typographical error in the omission of the words "out of" or words of similar meaning, between the words "paid" and "three-fourths" in the clause last quoted. There is no controversy in the case as to that.

The position of the vendor is, in substance, that the words "said commissions to be paid (out of) three-fourths of the collections received on sales until they are paid in

11

full," refer only to the "commission of 20% on the list prices aforesaid." That the contract, it is true, provides for an additional compensation to be paid the agent for making sale of the lots, namely, one-half of the "overage" aforesaid, but that the contract does not provide when such compensation is to be paid; and that the true meaning of the contract is that such part of the overage is to be paid by the vendor only after it has first actually collected the total minimum amount of the list price of all of the lots, (approximately $94,200.00 as aforesaid), and out of the actual collections of such "overage" made thereafter. That, in other words, as to the "overage," the contract is, in effect, that the vendor will pay the agent one-half of any amount over and above the sum of $94,200.00 (approximately) which the agent might succeed in obtaining for the property—and the cases of *Peters* v. *Anderson*, 88 Va. 1051, 14 S. E. 974; *Munroe* v. *Taylor*, 191 Mass. 483, 78 N. E. 106; *Hinds* v. *Henry*, 36 N. J. L. 328, and other cases, which involve such character of contracts, are cited to support the position that the "overage" compensation to the agent in the case before us is not due or payable except out of the excess collections by the vendor over and above the said total of the list prices aforesaid for which as a minimum the property was to sell (viz., $94,200.00, approximately, as aforesaid).

These authorities are applicable and controlling in favor of the vendor, if such was the nature of the contract. But we do not so construe the contract.

We must construe the language which the parties use in the contract. That language, as used in the fifth clause of the contract seems plainly to fix all of the compensation to be paid the agent by the prices at which the agent may and does sell the lots. The agent is to receive a minimum compensation of "a commission" (in the singular number), "of 20%" on the total of the list prices of the lots sold, and, in addition thereto, one-half of the difference between the

total of list prices and the total of the actual selling prices of the lots sold, "said commissions" (in the plural), "to be paid (out of) three-fourths of the collections received on sales until they" (in the plural) "are paid in full." The agent was entitled to no commissions except on the lots actually sold. And the minimum compensation of the agent, as fixed in the contract, is based on selling prices, not collections, except as affected by the limitation that such compensation should not exceed "three-fourths of the collections received on sales." Similarly, the additional compensation to be paid the agent, of the one-half of the "overage," as fixed in the contract, is based on the selling prices, not collections, except as affected by the same limitation that such compensation, together with the minimum compensation aforesaid, should not exceed "three-fourths of the collections received on sales." There is no distinction made in the language of the contract between the "collections" out of which any of the compensation to the agent is to be paid. The compensation which is to be paid out of three-fourths of the collections is referred to in the contract in the plural (as "commissions") whereas, the minimum percentage compensation is referred to as "a commission;" and "they" are to be paid as aforesaid, as provided in the contract, "until they are paid in full."

We are of opinion, therefore, that the contract is not silent as to when the "overage" compensation to the agent is to be paid, but is a complete contract on that subject, as well as on the subject of the 20% commission provided for therein. We think that the contract on the face of it provides how and when the whole compensation to the agent is to be paid, namely, out of three-fourths of all collections of purchase money made by the vendor.

Hence, we find no error in the judgment under review, and it will be affirmed.

*Affirmed.*